**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DELANE J. WELTCH; TYSHIA RENNICK; ED PARKER; GEORGE MACLEOD; SANDEEP SINGH; BRANDON TRUSH; KEERTHANA KULENDRAN; NINA FROGGATT; RACHAEL SPOTTS; GRACE MOX; JORDAN MASON; SARAH SMOTHERS; VISHVAS DOSHI; CHRIS BAUER; JOSH MYERS; GENARO SCALA; KARLY SOLDNER; MATT DELATOUR; TIERYN TERRELL; BETH EISENBERG; LISA JACOBS; BRITTANY KEESLING; CHELSEA DALSEY; ALEXANDER MARSHALL; ADARA MORGANSTEIN; LEXI BUSSEY; KASYA O'CONNOR GRANT; CASSANDRA FOLEY; KELLEN MATTHEWS-THOMPSON; MATTHEW OBER; AFOR UKO UCHE; HANNAH BACHISM; CHRISTOPHER THOMAS; TALI BURRY-SCHNEPP; MATTHEW LORETI; SASKIA GLOBIG; VANESSA ROSENSWEET; EVAN MOFFITT; ANLIN WANG; WOLFGANG SCHWAN; FLYNN KRAPF,** | **CIVIL ACTION**<br><br>**No. 20-____________**<br><br>**JURY TRIAL DEMANDED** |
| **Plaintiffs,** | |
| **v.** | |
| **CITY OF PHILADELPHIA; JOHN DOES 1-100,** | |
| **Defendants.** | |

# COMPLAINT

## I. PRELIMINARY STATEMENT

1. On June 1, 2020, the City of Philadelphia's highest-level officials ordered and directed an extraordinary abuse of police power against protesters engaged in a peaceful demonstration on the Vine Street Expressway. Following those orders, police officers used tear gas and "less-than-lethal" projectiles and other devices against non-violent protesters. At no

time were these actions justified. They were grossly excessive and caused unnecessary physical and emotional injury to hundreds of peaceful protesters.

2. Plaintiffs are a diverse group who were peacefully protesting against systemic police misconduct and were subjected to the City's unlawful actions. They bring this civil rights action under 42 U.S.C. § 1983 seeking to hold the City accountable for violations of their First and Fourth Amendment rights.

3. On May 25, 2020, George Floyd, a 46-year-old Black man, was killed by police officers in Minneapolis. The actions leading to Mr. Floyd's death were captured on a cellphone video recorded by a civilian witness. The witness posted the video to social media, and, by the next morning, the video had gone viral, having been viewed many millions of times. The video showed a brutal and senseless murder by Minneapolis Police Officer Derek Chauvin who had kneeled on Mr. Floyd's neck for 8 minutes and 46 seconds. Before he became unresponsive, Mr. Floyd could be heard pleading for his life, saying repeatedly: "I can't breathe."

4. In the 24 hours that followed the posting of the video, protests started in Minneapolis. Within days, tens of thousands of demonstrators took to the streets in small towns and major cities across the United States. By week's end, protests were occurring on a daily basis all over the world. In these protests, demonstrators expressed frustration and anger over an unending line of racist murders of Black people, including the recent deaths of Breonna Taylor and Ahmaud Arbery, culminating in the killing of Mr. Floyd. At the core of these protests was a central demand: an end to, and accountability for, police brutality.

5. In Philadelphia, a city with a long history of racist and violent police practices, people participated in multiple demonstrations in the week after George Floyd's death. As was widely reported in local media, the Philadelphia Police Department ("PPD") failed to

appropriately respond to the demonstrations, and, rather than taking steps to ensure the safety of people engaged in peaceful protest, the City's officers responded with violent and aggressive tactics, resulting in increasing public anger and frustration.

6. On June 1, 2020, the largest demonstration yet took place in Philadelphia. Thousands of protesters marched through the streets of Center City and made their way to the Vine Street Expressway, where they entered the highway causing traffic to stop. Protesters marched along the highway, chanting and waving signs. Drivers whose cars were stopped by the demonstration honked horns in support of the protesters. The demonstration remained peaceful.

7. Without provocation or warning, however, officers began to fire tear gas canisters at the demonstrators. As demonstrators began to flee, officers fired what were later described as "less-than-lethal" munitions and devices at demonstrators.

8. Through their use of tear gas and other harmful devices, and their positioning of personnel, officers closed off exit points, pinning hundreds of demonstrators onto a steep grassy, fenced-in embankment on the north side of the highway. As demonstrators were trapped on that embankment, officers continued to fire tear gas canisters and other harmful munitions at them, leaving them trapped in a suffocating cloud of smoke and gas. Video recordings made by people at the scene were rapidly posted to social media platforms showing protesters overcome by the gas, screaming—in a disturbing echo of George Floyd's last words—"I can't breathe."

9. The people subjected to these unlawful actions had gone into the City streets to protest against police brutality. In return for their actions, they were victimized by police brutality. Many of the people subjected to teargas and munitions, including the plaintiffs, suffered substantial harms, including physical injuries, sustained respiratory distress, nausea and vomiting, and significant emotional trauma.

10. On June 2, 2020, the day after the incident, Philadelphia Police Commissioner Danielle Outlaw issued a memorandum to all PPD officers acknowledging that the decision to use the force seen on the Vine Street Expressway was a decision made with full deliberation by the City. Commissioner Outlaw confirmed that the harms caused to the peaceful demonstrators who entered the highway were the result of the City's policy choice.

11. Over the next several weeks, City officials received persistent and vocal criticism for the use of force they authorized on the Vine Street Expressway. In response, these officials gave shifting explanations for who made the decision to use that force, while also claiming that the force was justified by the circumstances of the demonstration.

12. On June 25, 2020, The New York Times published a visual investigation based on an online compilation of videos collected from the scene.[1] That investigation demonstrated that the protest on the Vine Street Expressway was not violent and that the police use of force on protesters was grossly excessive. Within hours of publication of the investigation, Philadelphia Mayor Jim Kenney and Commissioner Outlaw publicly apologized for the use of force against peaceful protesters and for the decision to use tear gas and other harmful munitions and force. Immediately after the news conference, Mayor Kenney sent a tweet acknowledging that "members of the Police Department used completely unacceptable force" and stating: "I also am accountable."[2]

[1] Christopher Koettl et al., *How the Philadelphia Police Tear-Gassed a Group of Trapped Protesters*, New York Times (June 25, 2020), *available at*, https://www.nytimes.com/video/us/100000007174941/philadelphia-tear-gas-george-floyd-protests.html.

[2] Jim Kenney, Twitter (June 25, 2020), *available at*, https://twitter.com/PhillyMayor/status/1276242680612347907.

13. Plaintiffs seek to hold the City and its policymakers to their promise of accountability.

## II. JURISDICTION

14. This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

## III. PARTIES

### A. Plaintiffs

15. The following 41 plaintiffs marched on the Vine Street Expressway on June 1, 2020, to express their opposition to systemic police misconduct and violence and were themselves subjected to, and harmed by, the unlawful use of police force.

16. Plaintiff Delane J. Weltch is a 36-year-old resident of Florence, New Jersey.

17. Plaintiff Tyshia Rennick is a 26-year-old resident of Philadelphia, Pennsylvania.

18. Plaintiff Ed Parker is a 28-year-old resident of Philadelphia, Pennsylvania.

19. Plaintiff George MacLeod is a 25-year-old resident of Philadelphia, Pennsylvania.

20. Plaintiff Sandeep Singh is a 34-year-old resident of Philadelphia, Pennsylvania.

21. Plaintiff Brandon Trush is a 25-year-old resident of Philadelphia, Pennsylvania.

22. Plaintiff Keerthana Kulendran is a 26-year-old resident of Philadelphia, Pennsylvania.

23. Plaintiff Nina Froggatt is a 31-year-old resident of Philadelphia, Pennsylvania.

24. Plaintiff Rachael Spotts is a 31-year-old resident of Philadelphia, Pennsylvania.

25. Plaintiff Grace Mox is a 19-year-old resident of Philadelphia, Pennsylvania.

26. Plaintiff Jordan Mason is a 24-year-old resident of Warminster, Pennsylvania.

27. Plaintiff Sarah Smothers is a 34-year-old resident of Philadelphia, Pennsylvania.

28. Plaintiff Vishvas Doshi is a 39-year-old resident of Philadelphia, Pennsylvania.

29. Plaintiff Chris Bauer is a 26-year-old resident of Philadelphia, Pennsylvania.

30. Plaintiff Josh Myers is a 26-year-old resident of Philadelphia, Pennsylvania.

31. Plaintiff Genaro Scala is a 26-year-old resident of Philadelphia, Pennsylvania.

32. Plaintiff Karly Soldner is a 26-year-old resident of Philadelphia, Pennsylvania.

33. Plaintiff Matt Delatour is a 28-year-old resident of Philadelphia, Pennsylvania.

34. Plaintiff Tieryn Terrell is a 24-year-old resident of Philadelphia, Pennsylvania.

35. Plaintiff Beth Eisenberg is a 41-year-old resident of Philadelphia, Pennsylvania.

36. Plaintiff Lisa Jacobs is a 37-year-old resident of Philadelphia, Pennsylvania.

37. Plaintiff Brittany Keesling is a 31-year-old resident of Philadelphia, Pennsylvania.

38. Plaintiff Chelsea Dalsey is a 35-year-old resident of Philadelphia, Pennsylvania.

39. Plaintiff Alexander Marshall is a 23-year-old resident of Ambler, Pennsylvania.

40. Plaintiff Adara Morganstein is an 18-year-old resident of West Chester, Pennsylvania.

41. Plaintiff Lexi Bussey is a 19-year-old resident of West Chester, Pennsylvania.

42. Plaintiff Kasya O'Connor Grant is a 26-year-old resident of Philadelphia, Pennsylvania.

43. Plaintiff Cassandra Foley is a 28-year-old resident of Glenside, Pennsylvania.

44. Plaintiff Kellen Matthews-Thompson is a 28-year-old resident of Glenside, Pennsylvania.

45. Plaintiff Matthew Ober is a 25-year-old resident of Philadelphia, Pennsylvania.

46. Plaintiff Afor Uko Uche is a 30-year-old resident of Philadelphia, Pennsylvania.

47. Plaintiff Hannah Bachism is a 20-year-old resident of Philadelphia, Pennsylvania.

48. Plaintiff Christopher Thomas is a 31-year-old resident of Philadelphia, Pennsylvania.

49. Plaintiff Tali Burry-Schnepp is a 20-year-old resident of Philadelphia, Pennsylvania.

50. Plaintiff Matthew Loreti is a 25-year-old resident of Philadelphia, Pennsylvania.

51. Plaintiff Saskia Globig is a 22-year-old resident of Philadelphia, Pennsylvania.

52. Plaintiff Vanessa Rosensweet is a 23-year-old resident of Philadelphia, Pennsylvania.

53. Plaintiff Evan Moffitt is a 25-year-old resident of Philadelphia, Pennsylvania.

54. Plaintiff Anlin Wang is a 27-year-old resident of Philadelphia, Pennsylvania.

55. Plaintiff Wolfgang Schwan is a 29-year-old resident of Philadelphia, Pennsylvania.

56. Plaintiff Flynn Krapf is an 18-year-old resident of West Chester, Pennsylvania.

**B. Defendants**

57. Defendant City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department. At all times relevant to this Complaint, each of the City officials referenced below, including Mayor Jim Kenney, Managing Director Brian Abernathy, Commissioner Danielle Outlaw, and Deputy Commissioner Dennis Wilson was a policymaker for the City of Philadelphia with respect to police matters. To the extent that any of these or other officials is not deemed a policymaker under relevant law, each official had policymaker authority delegated to them with respect to the matters in this Complaint.

58. Defendants John Does 1-100 were at all times relevant to this Complaint police officers employed by the City of Philadelphia, Pennsylvania State Police, and other law enforcement agencies who acted under the direction of, and in concert and conspiracy with, the City of Philadelphia. The identities of these defendants are not presently known, and plaintiffs will amend this Complaint to properly name all defendants after preliminary discovery.

59. At all times relevant to this Complaint, all defendants acted under color of state law and in concert and conspiracy. All defendants are jointly and severally responsible for the harms caused to plaintiffs.

## IV. FACTS

### A. The City of Philadelphia's History of Aggressive and Unlawful Response to Peaceful Protest

60. The police actions on the Vine Street Expressway on June 1, 2020, were the latest episode in a long history of abusive conduct by Philadelphia police in response to peaceful protest and political expression protected by the First Amendment.

61. The Philadelphia Inquirer has documented that the City "has a long history of police brutality," extending nearly two centuries into the past, with Black people bearing the brunt of that brutality.[3]

62. More recently, over the past several decades, Philadelphia police have systematically violated basic constitutional rules protecting the rights of private citizens to make their voices heard.

63. By way of example, in the summer of 2000, Philadelphia was the site of days of large political demonstrations in connection with the City's hosting of the Republican National

[3] Dain Saint et al., *Special Report: Black and Blue*, The Philadelphia Inquirer (July 12, 2020), *available at*, https://www.inquirer.com/news/inq/philadelphia-police-brutality-history-frank-rizzo-20200710.html.

Convention. In response to those demonstrations, Philadelphia police repeatedly used excessive force and their arrest powers to suppress lawful protest activity, including surreptitiously infiltrating protest groups and preemptively raiding a West Philadelphia puppet-making warehouse. Nearly 400 people were arrested, with many held in custody on extremely high bails to keep them off the streets until the convention was concluded. Once the criminal charges were brought to court, however, nearly all were dismissed or ended in acquittals. Over the next several years, the City agreed to settlements of resulting civil rights lawsuits with payments totaling hundreds of thousands of dollars.

64. In the fall of 2011, Occupy Philadelphia—an encampment of political demonstrators at City Hall arising out of the nationwide Occupy Wall Street movement—was the subject of similarly abusive conduct. On November 30, 2011, in an action directed by then Commissioner Charles H. Ramsey, police evicted the demonstrators from City Hall and trailed them while they peacefully marched through the City, only to then engage in mass groundless arrests. Following a criminal trial which resulted in the acquittal of all of the arrestees, the City, yet again, paid hundreds of thousands of dollars to those who had been unlawfully detained and charged.

65. Despite this history, through the early 2010s, the City continued in its acquiescence to, and enabling of, unconstitutional conduct by its officers. In that time period, as the use of smart phones to video police engaged in misconduct grew rapidly, Philadelphia police officers routinely retaliated against civilians who sought to observe and record public police activity. While City officials were aware that PPD officers had arrested and physically abused people for the mere act of video-recording, they failed to train, supervise, and discipline the City's officers. Instead, in response to lawsuits brought by people subjected to such unlawful

retaliation, the City argued in federal courts that its officers were protected by the legal doctrine of qualified immunity. In July 2017, after more than five years of litigation of such lawsuits, the Third Circuit issued a precedential decision in *Fields v. City of Philadelphia* ruling that the First Amendment protects civilians engaged in the act of photographing, filming, or otherwise recording police conducting their official duties in public.

66. The above examples are a small selection of high profile incidents in which Philadelphia police have used unlawful force against political demonstrators and people engaged in protected First Amendment activity. Given this history, by June 1, 2020, the City's policymakers knew and understood that Philadelphia police officers would continue to engage in such misconduct in the event of mass political protest.

### B. Protest in Philadelphia Following the Murder of George Floyd and the Decision of Policymakers to use Excessive Force through Tear Gas and "Less-Than-Lethal" Munitions

67. Minneapolis police murdered George Floyd on Memorial Day, Monday, May 25, 2020. Over the next several days, protests grew around the country and in Philadelphia. As the first weekend following Floyd's murder approached, City officials knew to expect massive demonstrations throughout the City.

68. Based on prior experience, the City had in place operational plans to deal with massive protests. The plans were focused on activating hundreds of officers to engage in crowd control with the goal of allowing peaceful protesters to march with minimal interference.

69. Despite their knowledge and expectation that massive protests would occur all over the City, by Saturday, May 30, PPD had not implemented any of their previously existing operational plans to ensure the safety of the public and the demonstrators.

70. Protests grew in size throughout Center City Philadelphia, and some people began to vandalize stores in major retail corridors. As people stole merchandize from stores, City policymakers provided officers no coordinated plan. Scores of people were injured and properties were damaged.

71. The next day, May 31, Commissioner Outlaw acknowledged that the PPD had been slow to implement a plan to respond to protests, telling reporters that coordinated implementation of a strategy "did not happen as quickly as I would've liked it to occur."[4]

72. In the afternoon and evening of May 31, hours after Commissioner Outlaw acknowledged PPD's poor planning for demonstrations, a large group of protesters gathered on 52nd Street, known as West Philadelphia's Main Street. Based on reports of looting of commercial establishments, police brought into the area military style armored vehicles. Officers in those vehicles, outfitted in full body armor with gas masks, face shields, and helmets, exited those vehicles and fired tear gas at alleged "looters." Officers did not stop there, continuing to fire tear gas canisters on residential streets, causing extreme physical and mental harm to non-violent protesters as well as residents who were, among other things, merely standing on their front porches.

73. It thus became clear that by the afternoon of May 31, the City's policymakers had developed a plan to use extreme force, including tear gas, pepper spray, and other munitions such as flash bombs, bean bags, stinger balls, and/or "rubber bullets."

---

[4] Chris Palmer et al., *As unrest spreads, Philly officials struggle to assess police response to the violence and looting*, The Philadelphia Inquirer (May 31, 2020), *available at*, https://www.inquirer.com/news/philadelphia-police-department-george-floyd-protests-looting-violence-vandalism-20200531.html.

74. The use of each of these mechanisms against non-violent political protesters or, more generally, for crowd control in the context of political demonstrations is highly controversial, as each one poses substantial risks to health and safety:

a. Tear gas, or "CS gas," is a synthetic compound that causes irritation of mucous membranes, the skin, and the eyes, resulting in tearing, extreme pain, coughing, and difficulty breathing. It is also believed to have harmful impacts on reproductive health and menstruation. Tear gas is usually deployed through the firing of canisters, which explode and release the compound in the air. When used in close spaces or in large amounts, these effects can be enhanced, or even fatal. The firing of canisters directly at people can additionally cause substantial injury. Under the Geneva Convention, the use of tear gas is banned in warfare.

b. Pepper spray, also known as oleoresin capsicum, or OC spray, is different from tear gas in that it is not synthetic. It causes extreme pain in the eyes, often described as a "bubbling" or "boiling" sensation, and it can restrict breathing. Pepper spray is deployed through aerosolizing the compound in liquid streams or mists. It is also sometimes fired in a projectile known as a "pepper ball." Pepper spray is particularly dangerous for people with preexisting breathing deficits, such as asthma.

c. Less-than-lethal projectiles, broadly defined, are munitions made from many different substances, including rubber, wood, or wax, that are fired from specially designed weapons. Although intended not to cause fatalities, such projectiles are known to cause severe incapacitating, often permanent,

injuries, including the loss of eyes, broken bones, and damaged internal organs.

75. Given the dangerous nature of tear gas, pepper spray and less-than-lethal projectiles, standard police practices limit their usage to the most extreme circumstances. At a minimum, such tactics require the presence of severe danger to the physical safety of other persons. As such, published Philadelphia police directives provide, with respect to pepper spray, that it is not to be used "[f]or the dispersal of non-violent persons," "[f]or disorderly crowds," or "[i]n situations where people are peacefully exercising their Constitutional Rights of free speech of assembly."[5]

### C. The June 1, 2020, Philadelphia Police Assault on Vine Street Expressway Demonstrators

76. As of the morning of June 1, 2020, the City's policymakers knew that the police tactics employed on 52nd Street the night before had caused severe harm to dozens of innocent people. Despite that knowledge, they made no changes to their operational plans.

77. On the afternoon of June 1, thousands of demonstrators gathered in Center City Philadelphia and began marching through the streets. As with protests that had occurred in Philadelphia—and around the world—demonstrators were protesting racist police violence. Demonstrators chanted "Black Lives Matter" and held signs demanding accountability and systemic reform. The demonstration was peaceful and non-violent.

78. Shortly before 5:00 p.m., the march made its way to the intersection of North 22nd Street and the Benjamin Franklin Parkway. From there, demonstrators marched down an entrance ramp and a nearby embankment from North 22nd Street onto Interstate 676, known

---

[5] Philadelphia Police Department Directive 10.2, *Use of Moderate/Limited Force* at 9-10 (Sept. 18, 2015), *available at*, https://www.phillypolice.com/assets/directives/D10.2-UseOfModerateLimitedForce.pdf

locally as the Vine Street Expressway, a below-ground-level highway that traverses Center City Philadelphia from east to west and west to east. Demonstrators were not stopped from entering the highway.

79. Traffic on the highway stopped as demonstrators began to flood into all lanes. Many drivers in the stopped cars honked horns and waved to demonstrators in a show of support for their political message.

80. Demonstrators continued marching east on the highway. They were not violent. They used no physical force. No one on the highway—including police present for the purported purpose of crowd control—was in physical danger.

81. As protesters continued to march east under the North 21st Street overpass, demonstrators at the front of the march entered a long tunnel.

82. Before they reached the other side of the tunnel, which ends just to the east of North 20th Street, a police SWAT team entered the tunnel from the east side. Members of the SWAT team were, like the officers present on 52nd Street the night before, dressed in full body armor, with helmets and face shields.

83. The SWAT team approached the marching demonstrators armed with pepper spray canisters. They gave no warning or direction to the demonstrators. Instead, they advanced in a line, using pepper spray and less-than-lethal projectiles against demonstrators, even as demonstrators were attempting to turn around and go back the other way or sitting peacefully on the highway. Officers also used pepper spray to target demonstrators who were filming their actions.

84. The SWAT team's actions caused an abrupt halt to the march as demonstrators quickly fled back to the west. While the march came to a halt, the demonstrators on the highway continued to engage in peaceful protest, chanting and waving signs.

85. As the march halted, another SWAT team entered the highway from the west, using a military style armored vehicle.

86. As a result, hundreds of demonstrators were now pinned between two police teams which had cut off any means of exiting the highway.

87. Shortly after the second SWAT team arrived on the scene in the armored vehicle, officers began firing tear gas canisters at the crowd of demonstrators.

88. Before doing so, no officers ordered demonstrators to leave the highway. Nor did any officers warn demonstrators that they would be subjected to the use of force—let alone, tear gas—if they did not immediately leave the highway.

89. Demonstrators were thus stuck on the highway without any indication that they would be subject to an extreme, dangerous, and harmful use of force.

90. After the first firing of canisters, frantic demonstrators attempted to leave the highway. Some were able to leave via entrance and exit ramps that took them to North 22nd Street.

91. Other demonstrators were able to leave via a steep embankment near the 21st Street overpass and the opening in a fence near the North 22nd Street entrance ramp. As demonstrators fled in this direction, police officers deployed pepper spray against them. Officers carrying shields then formed a line in front of the fence opening, closing off this exit.

92. Several hundred demonstrators were left trapped between the two SWAT teams. The only path to exit was a steep grassy hill on the north side of the highway to the east of North

21st Street. At the top of that hill was a concrete barrier, and on top of that barrier was a tall metal fence.

93. To get away from the tear gas that officers had dispersed, remaining demonstrators trapped on the highway began to climb the hill, all while they were suffering the effects of tear gas. Some, with the assistance of others, were able to climb over the barrier and fence at the top of the hill to reach street level.

94. Shortly after police fired the first tear gas canisters, all demonstrators had left the highway, and police directed the cars that had been stopped on the highway to continue driving.

95. At this point, all demonstrators were attempting to leave the highway, and no demonstrators were obstructing traffic, or doing anything other than protecting themselves from injury. Still, police continued to fire tear gas canisters, pepper spray, and other less-than-lethal devices directly at the demonstrators trapped on the hill.

96. These actions left hundreds of demonstrators stranded on the hill, unable to leave, engulfed in clouds of smoke and tear gas. Demonstrators were overcome with tear gas, coughing, vomiting, crying, unable to breathe, and, in some cases, losing consciousness.

97. Many demonstrators had been wearing masks in order to protect themselves, and others, from the spread of COVID-19. As demonstrators attempted to flee, many lost their masks or had to remove them in order to breathe because their masks were saturated with tear gas. Those stuck on the hill in a large crowd of coughing, unmasked people were subjected to a dangerous and increased risk of contracting COVID-19.

98. The purported purpose of tear gas in a law enforcement context is to disperse unruly and violent crowds. Given the actions of the officers, however, the non-violent

demonstrators who were attacked with tear gas were unable to disperse, thus resulting in enhanced and prolonged exposure to the gas.

99. As officers were subjecting them to the harmful effects of tear gas, other officers began to discharge less-than-lethal munitions at the demonstrators. Multiple demonstrators were struck with objects which caused severe physical pain and injury.

100. For those demonstrators who were able to leave the highway, they were met with a terrifying scene: demonstrators screaming, pouring water and milk into their burning eyes, trying to help trapped people escape the cloud of smoke and gas, and attempting to locate friends and family members from whom they had been separated.

101. As they did so, officers continued to deploy tear gas canisters, firing them at people standing and filming on the nearby overpasses.

102. Police also used long-range acoustic devices against demonstrators as they tried to leave the area.

103. With hundreds of demonstrators remaining pinned in place on the hill with no ability to leave, officers in full body armor began to climb the hill and take many of them into custody. Officers violently grabbed demonstrators, placed them in zip-tie handcuffs, and dragged them down the hill.

104. Demonstrators taken into custody were forced to sit on the highway. They were later placed onto buses and taken to a variety of police districts. While packed into buses and in crowded police districts, some demonstrators who sought to wear masks to protect themselves and others from COVID-19 had their masks removed and confiscated. Conditions on the buses were hot and stifling, and demonstrators were kept on the buses for prolonged periods of time.

105. Demonstrators taken to various police districts were given code violation notices (CVNs) for "failure to disperse," "disorderly conduct," and "violation of the emergency curfew order" under various Philadelphia City Code provisions. These CVNs had no legal basis and each person who received a CVN had been engaged in a non-violent political demonstration.

106. On July 8, 2020, Mayor Kenney announced that the City would waive all CVNs issued as a result of protest activity between May 30, 2020, and June 30, 2020, including all CVNs issued to plaintiffs.[6]

107. At no time during the demonstration was any of the force used by law enforcement officers justified or proportional. To the contrary, all force used was unprovoked, unjustified, extreme, and unlawful, and no reasonable officer could believe that the force used was appropriate under the circumstances.

**D. City Policymakers' Shifting Justifications for the Police use of Force on the Vine Street Expressway**

108. In the immediate aftermath of the police action on the Vine Street Expressway, Commissioner Outlaw asserted that the use of tear gas and less-than-lethal munitions was an appropriate and proportionate response to the demonstration.

109. In a statement issued late the night of June 1, Commissioner Outlaw said protesters "surrounded a State Trooper, who was alone and seated in his vehicle, and began rocking the vehicle, with the trooper having no safe means of egress."[7]

---

[6] Jim Kenney, Twitter (July 8, 2020), *available at*, https://twitter.com/PhillyMayor/status/1280935440023986185.

[7] Chris Palmer & Ellie Rushing, *Philly Police Commissioner Danielle Outlaw, Mayor Jim Kenney apologize for teargassing of protesters on 676*, The Philadelphia Inquirer (June 25, 2020), *available at*, https://www.inquirer.com/news/philadelphia-protests-676-teargas-mayor-jim-kenney-danielle-outlaw-20200625.html.

110. Commissioner Outlaw additionally stated on June 1 that people in the "crowd began throwing rocks at the officers from the north and south sides, and from the bridges above the officers. The crowd also began rushing toward the officers."[8]

111. Mayor Kenney also claimed that the police action was appropriate, stating through a spokesperson on the night of June 1 that the information about protesters throwing rocks came from firsthand accounts of high-ranking police commanders who witnessed the incident.[9]

112. The next day, June 2, Commissioner Outlaw issued a memorandum to all officers in the Philadelphia Police Department. In that memorandum, she acknowledged that the force used on the Vine Street Expressway was a result of a deliberate decision by the City's policymakers. Outlaw wrote: "The City's decision to deploy less than lethal munitions was deliberate and deemed necessary for safety for both officers and those protesters who swarmed the interstate highway."[10]

113. In the days that followed, members of the public, demonstrators who were present on the Vine Street Expressway, Philadelphia City Councilmembers, and the media questioned City officials as to whether there was any evidence to support their assertions that the use of force was justified.

---

[8] *Id.*

[9] *Id.*

[10] *See* Max Marin & Ryan Briggs, *Philly police commissioner alters use of force policy after tear gas, warns about press arrests*, WHYY (June 2, 2020), *available at*, https://whyy.org/articles/philly-police-commissioner-alters-use-of-force-policy-after-tear-gas-warns-about-press-arrests/. Counsel are in possession of a copy of Commissioner Outlaw's memorandum containing the quoted language.

114. Hundreds of demonstrators posted videos on various social media platforms. In none of the videos was there evidence of violence or any other circumstances that would have justified the extreme use of force, including tear gas, pepper spray, or less-than-lethal munitions.[11]

115. Despite the absence of evidence to support their claimed justifications for the extreme use of force, City officials refused to retract or reconsider their statements of June 1.

116. Instead, City policymakers provided shifting explanations for how the decision to use tear gas was made.

117. In a City Council budget hearing on June 10, 2020, City Managing Director Brian Abernathy stated that City policymakers had on May 31 given broad authorization for police to use tear gas. The decision was made, according to Abernathy, by the City's unified command group, which, in addition to Kenney, Outlaw, and Abernathy, included high-ranking officials from several City agencies. Commissioner Outlaw stated in the same budget hearing that the decision to use tear gas was left to the "commander on the ground." At no time in the hearing did Abernathy or Outlaw acknowledge that the use of force on the Vine Street Expressway was improper. To the contrary, Abernathy expressly declined an invitation from City Councilmember Helen Gym to disavow the future use of tear gas and rubber bullets.[12]

---

[11] Ryan Briggs & Max Marin, *Philly police say tear gas used because 676 protest turned hostile, but there's no evidence that happened*, WHYY (June 2, 2020), *available at*, https://whyy.org/articles/philly-police-say-tear-gas-used-because-676-protest-turned-hostile-but-theres-no-evidence-that-happened/.

[12] Laura McCrystal, *Mayor Jim Kenney approved tear gas use at Philly protests, officials say as City Council questions police response*, The Philadelphia Inquirer (June 10, 2020), *available at*, https://www.inquirer.com/news/tear-gas-protests-philadelphia-police-budget-20200610.html.

118. Five days later, facing criticism from reporting that the City had given broad authorization for the use of tear gas, Mayor Kenney and Commissioner Outlaw issued a statement announcing an independent investigation into police actions on the Vine Street Expressway. Kenney, departing from Abernathy's assertion, stated: "We did not, and would never, pre-authorize or give police officers free rein to use any type of force against peaceful protesters exercising their constitutional rights." Nowhere in the statement did Mayor Kenney or Commissioner Outlaw acknowledge that the use of force on the Vine Street Expressway was improper.[13]

119. By June 23, 2020, no City official had retracted Commissioner Outlaw's June 1 assertion that the use of tear gas was justified by danger posed to a Pennsylvania State Police trooper stranded alone in a police vehicle in the midst of the demonstration.

120. On June 23, 2020, the State Police released several hours of dashcam video and audio footage from the relevant vehicle. The video showed that the trooper stopped his vehicle in traffic after demonstrators entered the highway and that the trooper was able to safely leave the vehicle. As protesters walked past the vehicle, a person broadcasting on police radio can be heard stating: "All traffic is stopped. Repeat, they're peaceful, just walking eastbound." In short, the dashcam video confirmed that the initial representations used to justify the extreme use of force were false.[14]

---

[13] City of Philadelphia, *Mayor Kenney and Police Commissioner Outlaw Announce Plans for Independent After-Action Investigation of City's Response to Recent Protests* (June 15, 2020), *available at*, https://www.phila.gov/2020-06-15-mayor-kenney-and-police-commissioner-outlaw-announce-plans-for-independent-after-action-investigation-of-citys-response-to-recent-protests/.

[14] Ryan Briggs, *'They're peaceful': Pa. State Police release dashcam video from I-676 protest tear-gassing*, WHYY (June 23, 2020), *available at*, https://whyy.org/articles/theyre-peaceful-pa-state-police-release-dashcam-video-from-i-676-protest-tear-gassing/.

121. On June 25, 2020, The New York Times published its comprehensive video compilation of events on the Vine Street Expressway. The producers of the video reached two conclusions: the demonstration on the highway was not violent and the force used by police was excessive and unjustified.[15]

122. That afternoon, Kenney and Outlaw conducted their press conference in which they both apologized for the excessive use of force against peaceful demonstrators and acknowledged the need for accountability.[16]

123. While acknowledging at the press conference that police had used excessive force, and despite discussing concepts of accountability, Commissioner Outlaw claimed—for the first time since the June 1 event—that the decision to use tear gas had rested exclusively in the hands of Deputy Commissioner Dennis Wilson, who was, according to Outlaw, the "incident commander" on the Vine Street Expressway. Wilson was, as Commissioner Outlaw publicly stated, "falling on the sword." Wilson appeared at the press conference to personally announce that he would be taking a voluntary demotion.[17]

### E. Plaintiffs' Experiences on the Vine Street Expressway and their Harms and Losses

124. Each of the plaintiffs in this action was subjected to the above-described conduct of the John Doe defendants as directed by the City and suffered harms and losses for which they seek accountability in this action.

---

[15] *See supra* note 1.

[16] Max Marin & Ryan Briggs, *Kenney, Outlaw admit they were wrong about 676 protest tear-gassing, officers involved to be fired*, WHYY (June 25, 2020), *available at*, https://whyy.org/articles/kenney-outlaw-admit-they-were-wrong-about-676-protest-tear-gassing-officers-involved-to-be-fired/.

[17] *Id.*

125. Plaintiff Delane J. Weltch was tear-gassed and hit by nonlethal projectiles on the Expressway while covering the demonstrations as a journalist wearing a press insignia. He was also subjected to a long-range acoustic device while trying to leave the area. This use of force by the defendant officers caused Weltch to suffer immediate pain, vomiting and trauma. He continued to suffer from migraines for the two weeks following the demonstration. His camera was damaged while the crowd attempted to escape.

126. Plaintiff Tyshia Rennick was tear-gassed while peacefully demonstrating on the expressway. She suffered immediate pain and respiratory distress. While trying to leave the Expressway by climbing a gate, one of the officer defendants yanked her head backwards by her hair, which she had worn as an Afro. Rennick was zip-tied and fell as she was being escorted down the hill by a PPD officer. She was detained, transported to a police district nearly two miles away, and issued a CVN for "failure to disperse." She suffered an abrasion to her elbow and wrist pain which continues to this day.

127. Plaintiff Ed Parker, a former member of the National Guard, was tear-gassed on the Expressway while peacefully demonstrating. The teargas triggered an asthma attack, causing severe coughing and disorientation. While trying to leave the Expressway, Parker was zip-tied by one of the officer defendants and thrown to the ground. Officers restricted his attempts to use his inhaler and removed the mask he had worn to protect against transmission of COVID-19. Parker was transported to a police district nearly two miles away and received a CVN for "disorderly conduct" and "violation of emergency curfew order." Parker suffered multiple cuts, persistent throat pain from coughing, and mental health symptoms since the incident.

128. Plaintiff George MacLeod was tear-gassed on the Expressway while peacefully demonstrating. While attempting to help others escape the teargas by climbing a fence, a fellow

demonstrator fell on MacLeod. The fall knocked him unconscious and caused a dislocated shoulder.

129. Plaintiff Sandeep Singh was tear-gassed while peacefully demonstrating on the Expressway, working as a journalist, and filming the march. A tear gas canister hit him on arm leaving a circular burn matching the shape of the canister. Singh also suffered a cut to his neck from the same canister ricocheting off his body and the concrete wall next to him. The tear gas caused immediate eye pain and respiratory distress.

130. Plaintiff Brandon Trush was tear-gassed while peacefully demonstrating on the Expressway. In addition, while facing the police with his hands up, he was again tear-gassed and then struck on the chin with a less-than-lethal projectile fired by one of the officer defendants. The resulting wound required five internal and five external stitches to his chin. Trush also suffered emotional distress.

131. Plaintiff Keerthana Kulendran was tear-gassed while peacefully demonstrating on the Expressway. While attempting to leave the Expressway, she was overwhelmed by the gas, collapsed, and briefly lost consciousness on the nearby embankment. She suffered multiple bruises and a cut to her arm, continued skin irritation and throat pain, and a resurgence of symptoms related to a previously diagnosed mental health condition.

132. Plaintiff Nina Froggatt was tear-gassed while peacefully demonstrating on the Expressway. Her ingestion of the teargas caused repeated vomiting of a brown and black substance later in the day. In addition, she woke up with a fever the next day and experienced painful breathing issues for the next few weeks.

133. Plaintiff Rachael Spotts was tear-gassed while standing peacefully on the 22nd street overpass above the Expressway. Officers in a nearby tank with a Pennsylvania State Police

insignia threw both flash bang devices and teargas at her. The rest of that night her breathing was labored and painful, leading to extreme lightheadedness and dizziness. Because her symptoms persisted the next day, she sought treatment at a local hospital. She was diagnosed with irritation of the lung lining and prescribed medication.

134. Plaintiff Grace Mox was tear-gassed and then detained while peacefully demonstrating on the Expressway. While detained, Mox was subject to an invasive full-body search that included an officer feeling underneath her shirt. Mox was forced to remain on a bus, zip-tied and without safeguards to protect her from COVID-19. Mox was issued a CVN charging "failure to disperse."

135. Plaintiff Jordan Mason was tear-gassed while peacefully demonstrating on the Expressway. In addition to the immediate and intense pain and respiratory distress caused by the teargas, Mason suffered further physical and psychological injury. She is asthmatic and faced respiratory discomfort for several days. While attempting to flee, she obtained bruises that remained on her body for weeks. Mason suffered substantial emotional trauma, causing her to seek increased mental health treatment. Finally, since the attack, she has faced menstrual irregularities.

136. Plaintiff Sarah Smothers was tear-gassed and detained while peacefully demonstrating on the Expressway. In addition to eye and lung pain and intense nausea experienced immediately after coming into contact with the teargas, she suffered prolonged thumb numbness as a result of the zip-ties police used to detain her, which limited blood circulation to her fingers. Further, she was taken to a police precinct without any precautions to protect against the transmission of COVID-19. Smothers received a CVN for "failure to disperse."

137. Plaintiff Vishvas Doshi was tear-gassed while peacefully demonstrating on the Expressway. He immediately suffered burning in his eyes and respiratory distress. While trying to leave the Expressway, some of the officer defendants yelled at him to turn around. He was zip-tied and pulled down the hill. While detained on the Expressway, the officers cut off the mask he was wearing to protect against the transmission of COVID-19. Doshi and approximately two dozen other demonstrators were then held, without any face masks, on a poorly ventilated bus for two hours. He was driven to a police district and given a CVN for "failure to disperse." He suffered abrasions and bruising and felt spasms in his eyes for the rest of the day.

138. Plaintiff Chris Bauer was tear-gassed while peacefully demonstrating on the Expressway. As he attempted to leave the Expressway, he injured his left foot, which became swollen and discolored the next day. The injury grew painful enough to necessitate the use of crutches later in the week. In addition, Bauer experienced intense nausea up to 24 hours later and now experiences stress and anxiety whenever he sees police officers.

139. Plaintiff Josh Myers was tear-gassed while protesting peacefully on 676. He experienced immediate and intense eye, skin, and respiratory irritation from the gas, as well as severe anxiety, leading him to seek out mental health treatment.

140. Plaintiff Genaro Scala was pushed by one of the officer defendants while demonstrating peacefully. Then, he was tear-gassed and shot by a projectile. In addition to the immediate pain and respiratory discomfort caused by the teargas, Scala suffered an injury to his wrist that lasted for weeks.

141. Plaintiff Karly Soldner was tear-gassed and detained while peacefully demonstrating on the Expressway. She was overwhelmed by teargas and unable to remain

standing as she coughed and her vision became dim. An officer detained her, and she was taken on a bus to a police district where she was issued a CVN for "failure to disperse." As she was detained, no precautions were taken by police to protect her from COVID-19. She experienced skin irritation and pain while breathing for several days after the incident. In addition, she had an irregular, unusually heavy menstrual period the next day.

142. Plaintiff Matt Delatour was tear-gassed while peacefully demonstrating on the Expressway. A canister landed right in front of him when he was trapped on the highway embankment as he tried to leave the Expressway, causing him to ingest and breathe in a significant amount of gas. He was temporarily unable to see and became weak. While walking home he repeatedly vomited and experienced intense eye and lung irritation.

143. Plaintiff Tieryn Terrell was tear-gassed while peacefully protesting on an overpass overlooking the Expressway. Police initially used flash bang devices and teargas on her, causing skin, eye, and lung irritation. While she stood on the overpass, observing people being detained on the Expressway, police from the Expressway shot additional teargas canisters at her and other onlookers. She was left with bloody mucus in her mouth and nose and experienced burning on her skin and in her eyes for several hours.

144. Plaintiff Beth Eisenberg was tear-gassed while peacefully demonstrating on the Expressway. She suffered immediate pain and respiratory distress from the teargas, as well as bruising from the attempt to leave the Expressway.

145. Plaintiff Lisa Jacobs was tear-gassed while peacefully demonstrating on the Expressway. She suffered immediate pain and respiratory distress from the teargas.

146. Plaintiff Brittany Keesling was tear-gassed while peacefully demonstrating on the Expressway. In addition to the immediate pain and respiratory distress caused by the teargas, she

was twice struck in the back with a projectile, first while trying to take a photograph and, second, while her hands were raised in surrender, causing extensive bruising and prolonged pain. Keesling also suffered severe emotional distress.

147. Plaintiff Chelsea Dalsey was tear-gassed while peacefully demonstrating on the Expressway. The pain and respiratory distress caused by the teargas began immediately and continued for at least three days. In addition, Dalsey suffered from weeks of exacerbated migraines. Dalsey also suffered severe emotional distress.

148. Plaintiff Alexander Marshall was tear-gassed while peacefully demonstrating on the Expressway. He suffered immediate pain and respiratory distress from the teargas. Additionally, Marshall, a private music instructor, cancelled a week's worth of music lessons so that he could attempt to recover from the trauma caused by the officer defendants' actions.

149. Plaintiff Adara Morganstein was tear-gassed while peacefully demonstrating on the Expressway. While attempting to leave the Expressway, she sustained multiple bruises to her elbows and knees. For at least the next day she had headaches and a burning sensation on her skin and in her sinuses, as well as a persistent cough lasting for the next several days.

150. Plaintiff Lexi Bussey was tear-gassed while peacefully demonstrating on the Expressway. She experienced immediate burning in her eyes and nose from the gas, as well as trouble breathing. She also developed white, boil-like bumps on her skin, and her face continued to burn for hours after the incident.

151. Plaintiff Kasya O'Connor Grant was tear-gassed while peacefully demonstrating on the Expressway. In addition to the immediate pain caused by the teargas, she suffered respiratory problems for several weeks.

152. Plaintiff Cassandra Foley was tear-gassed while peacefully demonstrating on the Expressway. She suffers from asthma and the tear gas caused immediate pain and respiratory distress. While trying to leave the Expressway, she collapsed due to her difficulty breathing. She has been coughing ever since this incident and had to seek out and obtain a prescription for her cough.

153. Plaintiff Kellen Matthews-Thompson was tear-gassed and hit by a nonlethal projectile while peacefully demonstrating on the expressway. The tear gas caused immediate pain and respiratory distress. He felt like all he could do was cough and throw up. He continued to experience difficulty breathing for days afterwards. Additionally, in response to the trauma of the event, he missed a day of work and experienced symptoms of depression.

154. Plaintiff Matthew Ober was tear-gassed while peacefully demonstrating on the Expressway. In addition to the immediate pain caused by the teargas, his body was bruised in several locations as a result of his attempt to leave the Expressway. He continues to suffer post-incident psychological injuries including insomnia, restlessness, and difficulty focusing.

155. Plaintiff Afor Uko Uche was tear-gassed while peacefully demonstrating on the Expressway. In addition to immediate pain and irritation to her skin, eyes, and lungs, the teargas caused intense nausea for several hours after her initial exposure. She also experienced shortness of breath while trying to ride her bike home from the Expressway, forcing her to stop and walk multiple times. Since the attack, she has experienced irregularities in her menstrual cycle, including having multiple periods in a month.

156. Plaintiff Hannah Bachism was tear-gassed while peacefully demonstrating on the Expressway. She experienced immediate pain, trouble breathing and seeing, vomiting, and loss of bladder control as she attempted to leave the Expressway. Her breathing continued to be

labored days after, and she often felt exhausted and got headaches. She also had an irregular period the next day.

157. Plaintiff Christopher Thomas was tear-gassed while peacefully demonstrating on the Expressway. The teargas caused him immediate pain and respiratory distress. In addition, he was traumatized when one of the officer defendants pointed a firearm at him and others while he was peacefully demonstrating.

158. Plaintiff Tali Burry-Schnepp was tear-gassed and detained while peacefully demonstrating on the Expressway. She suffered immediate pain in her nose, lungs and eyes, and had trouble breathing. As she attempted to leave the Expressway, an officer pulled her off the fence she was climbing and zip-tied her. As she was detained, no precautions were taken by police to protect her from COVID-19. She received a CVN for "failure to disperse."

159. Plaintiff Matthew Loreti was tear-gassed while peacefully demonstrating on the Expressway. He suffered immediate pain and respiratory distress.

160. Plaintiff Saskia Globig, was tear-gassed while peacefully demonstrating on the Expressway. Globig suffered immediate pain and respiratory distress.

161. Plaintiff Vanessa Rosensweet was tear-gassed while peacefully demonstrating on the Expressway. She suffered immediate pain and respiratory distress.

162. Plaintiff Evan Moffitt was tear-gassed while peacefully demonstrating on the Expressway. He suffered immediate pain and respiratory distress.

163. Plaintiff Anlin Wang was tear-gassed while peacefully demonstrating on the Expressway. Wang suffered immediate and prolonged pain and respiratory distress as well as emotional distress.

164. Plaintiff Wolfgang Schwan was tear-gassed while peacefully demonstrating on the Expressway. Schwan suffered immediate and protracted pain and respiratory distress, emotional harm, and damage to his personal property.

165. Plaintiff Flynn Krapf was tear-gassed on the Expressway while peacefully demonstrating. Krapf felt immediate pain and respiratory distress. They also suffered abrasions and bruises from climbing a fence in order to leave the Expressway. Krapf continued to experience lung pain and headaches for days afterwards.

### F. Defendants' Violations of Plaintiffs' Constitutional Rights

166. The actions of the City of Philadelphia and defendants John Does 1-100 violated all plaintiffs' constitutional rights in at least two respects: (1) they violated the rights of plaintiffs to be free from the excessive use of force under the Fourth and Fourteenth Amendments to the U.S. Constitution, and (2) they retaliated against plaintiffs' exercise of free speech in violation of plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution.

167. For each of the plaintiffs who were detained, taken into custody and issued a citation, the City of Philadelphia and defendants John Does 1-100 violated their right to be free from an unlawful seizure without sufficient legal cause in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

168. At all times, the conduct of defendants John Does 1-100 was in willful, reckless, and callous disregard of plaintiffs' clearly established rights under federal and state law.

169. All of the unconstitutional actions described above were the result of specific decisions, authorization, and approval on the part of policymakers for the City of Philadelphia, and, as such, the City is responsible for the violation of plaintiffs' constitutional rights.

170. To the extent any of the above unconstitutional actions were not decided, authorized, or approved by City policymakers, all such actions were the result of decisions by City policymakers to delegate such decision-making authority to the persons who did authorize, direct, and approve the unconstitutional conduct.

171. To the extent any of the individual John Doe defendants acted outside the authorization, direction, or approval of City policymakers or the persons to whom policymaking authority was delegated, the City is responsible for failing to properly train, supervise, and/or discipline the officers who so acted. Given the City's known history of improper and excessive response to peaceful protest activity, the City's failures in this regard were with deliberate indifference to the risk of constitutional violations.

172. Further, the decision of the City's policymakers, or those to whom City policymakers had delegated relevant authority, not to deploy existing plans to ensure the safety of political demonstrators and the decision to allow the use of tear gas, pepper spray, less-than-lethal munitions, and other devices without adequate training in the use of such materials was deliberately indifferent to predictable constitutional violations.

## V. CAUSES OF ACTION

**COUNT 1**
**Plaintiffs v. Defendants City of Philadelphia and John Does 1-100**
**Unreasonable Use of Force**

173. All defendants caused the unreasonable use of force against all plaintiffs in violation of plaintiffs' rights to be free from the use of such force under the Fourth and Fourteenth Amendments to the U.S. Constitution.

**COUNT 2**
**Plaintiffs v. Defendants City of Philadelphia and John Does 1-100**
**Retaliation Against Free Expression**

174. All defendants caused the unlawful retaliation against plaintiffs' free expression and speech in violation of plaintiffs' rights under the First and Fourteenth Amendments to the U.S. Constitution.

**COUNT 3**
**Plaintiffs Burry-Schnepp, Mox, Smothers, Soldner, Rennick, Doshi, and Parker v. Defendants City of Philadelphia and John Does 1-100**
**Unreasonable Seizure**

175. All defendants cause the unlawful seizure of plaintiffs when they detained them without sufficient legal cause and held them in unreasonable conditions.

**COUNT 4**
**Plaintiffs v. Defendants City of Philadelphia and John Does 1-100**
**State Law Claims**

176. The conduct of defendants John Does 1-100 constituted the torts of false arrest, assault, and battery under the laws of the Commonwealth of Pennsylvania.

**WHEREFORE**, plaintiffs respectfully request:

A. Compensatory damages as to all defendants;

B. Punitive damages as to defendants John Does 1-100;

C. Reasonable attorneys' fees and costs;

D. Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

/s/ David Rudovsky
David Rudovsky
ID No. 15168
drudovsky@krlawphila.com

/s/ Paul Messing
Paul Messing
ID No. 17749
pmessing@krlawphila.com

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
ID No. 88227
jfeinberg@krlawphila.com

/s/ Susan M. Lin
Susan M. Lin
ID No. 94184
slin@krlawphila.com

KAIRYS, RUDOVSKY, MESSING,
FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
215-925-5365 (fax)
*Counsel for Plaintiffs*[18]

[18] Counsel gratefully acknowledge law student interns Nicholas Keoki Kilstein and Julia C. Sheppard for their assistance in the preparation of this Complaint.